

2006 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

3-8-2006

# Farber v. Paterson

Precedential or Non-Precedential: Precedential

Docket No. 04-4498

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2006

Recommended Citation

"Farber v. Paterson" (2006). *2006 Decisions.* Paper 1350.
http://digitalcommons.law.villanova.edu/thirdcircuit_2006/1350

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2006 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 04-4498

ROBERTA FARBER

v.

CITY OF PATERSON; JOSE TORRES;
ELIESER BURGOS; MARGE DIPASQUALE;
LOCAL 3474, AMERICAN FEDERATION OF
STATE, COUNTY & MUNICIPAL EMPLOYEES, AFL-CIO

Local 3474, American Federation of State,
County & Municipal Employees, AFL-CIO,
Appellant

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
D.C. Civil No. 03-cv-04535
District Judge:  The Honorable Dickinson R. Debevoise

Argued:  November 16, 2005

Before: BARRY and AMBRO, <u>Circuit Judges</u>, and POLLAK,[*]
<u>District Judge</u>

(Opinion Filed: March 8, 2006)

---

[*]The Honorable Louis H. Pollak, District Judge, United
States District Court for the Eastern District of Pennsylvania,
sitting by designation.

David B. Beckett, Esq. (Argued)
Szaferman, Lakind, Blumstein, Blader & Lehmann
101 Grovers Mill Road
Quakerbridge Executive Center
Suite 104
Lawrenceville, NJ 08648

Counsel for Appellant


James E. Patterson, Esq. (Argued)
Graham, Curtin & Sheridan
4 Headquarters Plaza
P.O. Box 1991
Morristown, NJ 07962

Counsel for Appellee

---

OPINION OF THE COURT

---

BARRY, Circuit Judge

The American Federation of State, County & Municipal Employees, AFL-CIO, Local 3474 ("Local 3474" or "the Union"), appeals the District Court's denial of its motion to dismiss. The District Court was persuaded, first, that political affiliation was a cognizable class under 42 U.S.C. § 1985(3) and, at least for purposes of a motion to dismiss, that the Union had conspired with appellee Roberta Farber's employer, the City of Paterson, to deprive her of her First Amendment rights on the basis of her political affiliation. The Court was also persuaded that Farber's claim that the Union breached its duty of fair representation in refusing to pursue a grievance on her behalf had been timely filed. We will affirm in part and reverse in part.

# I. Background and Procedural History

We have before us a classic example of political patronage. Democrat Jose Torres defeated Republican incumbent Mayor Martin G. Barnes in the May 2002 mayoral election in Paterson, New Jersey, and subsequently declared his intent to terminate City employees who supported the former mayor. Farber, a City employee and admitted supporter of Barnes and his policies, was terminated from her administrative, non-policymaking position on June 28, 2002, after approximately eleven years on the job. She was informed of her termination in a letter from the City's Assistant Personnel Director, Marge DiPasquale, whose niece, Farber claims, was later hired to fill her position.

After her termination, Farber asked the Union to file a grievance on her behalf against the City for allegedly breaching the collective bargaining agreement that governed her employment. A meeting was held between the Union and City representatives, but ultimately the Union rejected Farber's request, citing the fact that she was a provisional employee who could be terminated at will.[1] Farber alleges that the Union's president, Manuel Ojeda, a political ally of newly elected Mayor Torres, was thereafter appointed as the City's Director of Public

---

[1] Public employment in Paterson is governed by the New Jersey Civil Service Act, N.J. Stat. Ann. § 11A:1-1, *et seq*. The Act distinguishes between employees who are "regularly" appointed, *i.e.*, permanent employees, and those who are "provisionally" appointed. Provisional appointees hold their positions until a permanent employee is appointed, and in no case is the appointment to last longer than twelve months. N.J. Stat. Ann. § 11A:4-13(a)-(b); N.J. Admin. Code §§ 4A:1-1.3, 4-1.3. Despite this requirement, Farber remained a provisional employee with the City for the entire eleven-year length of her employment because the City allegedly failed to complete a multi-step process that would have changed her status to permanent.

3

Works.

Farber filed suit against the City and the Union, among others, alleging, *inter alia*, (1) that the City and the Union conspired to deprive her of her First Amendment rights because of her political affiliation, in violation of 42 U.S.C. § 1985(3); and (2) that the Union breached the duty of fair representation it owed to her under the New Jersey Constitution and the New Jersey Employer-Employee Relations Act, N.J. Stat. Ann. § 34:13A-5.3.

The Union moved to dismiss Farber's § 1985(3) and duty of fair representation claims pursuant to Federal Rule of Civil Procedure 12(b)(6), arguing that discrimination based on political affiliation cannot support a § 1985(3) claim, and that the duty of fair representation claim was time-barred. That motion was denied. *See Farber v. City of Paterson*, 327 F. Supp. 2d 401, 418-25 (D.N.J. 2004). Relying on *Perez v. Cucci*, 725 F. Supp. 209, 249-53 (D.N.J. 1989), *aff'd*, 898 F.2d 142 (3d Cir. 1990), the District Court determined that political affiliation is a cognizable class for § 1985(3) purposes, and that "Farber [pled] sufficient class-based animus when she alleged that Defendants conspired against her because she is a Republican." *Farber*, 327 F.Supp. 2d at 424-25. The District Court also determined that, despite the New Jersey Public Employment Relations Commission's "exclusive power" to prevent unions from engaging in "unfair practices" under N.J. Stat. Ann. § 34:13A-5.4(c), a litigant may bring a duty of fair representation claim under the Employer-Employee Relations Act in court without first resorting to the Commission. *Id.* at 419-20. The District Court then rejected the Union's argument that the six-month statute of limitations applicable to unfair practice charges before the Commission should also apply to a duty of fair representation claim at law. It held, instead, that New Jersey's general six-year limitations period for actions alleging "tortious injury to the rights of another," N.J. Stat. Ann § 2A:14-1, applied. 327 F.Supp. 2d at 421-22.

The Union moved under 28 U.S.C. § 1292(b) for an interlocutory appeal of the denial of its motion to dismiss. The

District Court granted the motion, certifying two issues:

> (1) Are people who share a political affiliation a cognizable class for [42 U.S.C.] § 1985(3) purposes?

> (2) Which statute of limitations applies to a claim brought in court for a union's breach of the duty of fair representation that is enunciated in the New Jersey [Employer-Employee Relations Act]?

We granted the Union's petition for leave to appeal. Our review of the denial of the Union's motion to dismiss is plenary. The facts alleged in the complaint and the reasonable inferences that can be drawn from those facts are accepted as true for purposes of this review.

## II. <u>42 U.S.C. § 1985(3)</u>

Section 1985(3) permits an action to be brought by one injured by a conspiracy formed "for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws." 42 U.S.C. § 1985(3). In a line of cases beginning with *Griffin v. Breckenridge*, 403 U.S. 88 (1971), the Supreme Court has made clear what a plaintiff must allege to state a claim under § 1985(3): "(1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and (3) an act in furtherance of the conspiracy; (4) whereby a person is injured in his person or property or deprived of any right or privilege of a citizen of the United States." *United Bhd. of Carpenters & Joiners v. Scott*, 463 U.S. 825, 828-29 (1983) (citing *Griffin*, 403 U.S. at 102-03).

Section 1985(3) was initially part of Section 2 of the Ku Klux Klan Act of 1871, an Act passed to give the federal government a weapon against the wave of anarchic and violent civil resistance to Reconstruction that marred the post-Civil War

5

South. *See Novotny v. Great Am. Fed. Sav. & Loan Ass'n*, 584 F.2d 1235, 1238-39 (3d Cir. 1978), *vacated on other grounds*, 442 U.S. 366 (1979);[2] *Keating v. Carey*, 706 F.2d 377, 385 (2d Cir. 1983). It does not create any substantive rights, but permits individuals to enforce substantive rights against conspiring private parties. *See, e.g.*, *Marino v. Bowers*, 657 F.2d 1363, 1371 (3d Cir. 1981); *Howard v. State Dep't of Highways*, 478 F.2d 581, 585 (10th Cir. 1973).

Due to restrictive, post-Reconstruction-era Supreme Court decisions, including one that held that § 1985(3) only reached public conspiracies, § 1985(3) was not utilized for about 70 years. In *Griffin*, however, the Court reversed course and held that a § 1985(3) claim can reach private as well as public conspiracies that seek to deprive a class of equal protection of the laws or equal privileges under the laws. 403 U.S. at 101. Thus, African-American plaintiffs were permitted to use § 1985(3) to sue their racially motivated white attackers for violating their constitutional right to travel. *Id.* at 103, 106.

Despite its application to private conspiracies, § 1985(3) was not intended to provide a federal remedy for "all tortious, conspiratorial interferences with the rights of others," or to be a "general federal tort law." *Id*. at 101-02. The *Griffin* Court emphasized that because § 1985(3) requires the "intent to

---

[2] While *Novotny*'s holding "that Title VII can be the source of a right asserted in an action brought pursuant to section 1985(3) was vacated by the Supreme Court," its "analysis of the history of section 1985(3) and [its] discussion of the classes to which it extends were unaffected." *Lake v. Arnold*, 112 F.3d 682, 686 n.6 (3d Cir. 1997); *see also Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 317 n.14 (1993) (Stevens, J., dissenting) (In *Novotny*, "[w]e had no occasion to agree or to disagree with the Court of Appeals' holding that conspiracies motivated by an invidious animus against women fall within § 1985(3) because we concluded that the deprivation of the subsequently created Title VII statutory right could not form the basis for a § 1985(3) claim.").

deprive of *equal* protection, or *equal* privileges and immunities," a claimant must allege "some racial, *or perhaps otherwise class-based*, invidiously discriminatory animus behind the conspirators' action" in order to state a claim. *Id*. at 102 (third emphasis added). The phrase "class-based invidiously discriminatory animus" would

> confine the authority of this law to the prevention of deprivations which shall attack the equality of rights of American citizens; that any violation of the right, the *animus* and effect of which is to strike down the citizen, to the end that he may not enjoy equality of rights as contrasted with his and other citizens' rights, shall be within the scope of the remedies of this section.

*Id*. at 100 (quoting Cong. Globe, 42d Cong., 1st Sess. App. 478 (1871) (Rep. Shellabarger)).

There are two distinct aspects to the "class-based invidiously discriminatory animus" which, we now know, will support a § 1985(3) claim – the first is defined by form, and the second by function. Thus, a plaintiff must allege both that the conspiracy was motivated by discriminatory animus against an identifiable class and that the discrimination against the identifiable class was invidious. *See Aulson v. Blanchard*, 83 F.3d 1, 4-5 (1st Cir. 1996).

Farber's claim that the Union and the City conspired against "supporter[s] of the former administration" fails to allege discriminatory animus against an identifiable class. But even if it did – if, for example, she alleged discriminatory animus against registered Republicans – any such animus would not trigger § 1985(3) protection. For one thing, the frequent mention of "Republicans" in the Act's legislative history, in and of itself, does not mean that Congress intended § 1985(3) to reach conspiracies bottomed on political affiliation. For another, unlike discrimination against a class on the basis of race, sex, or mental retardation, discrimination on the basis of political affiliation is not, as a matter of law, discrimination so invidious

7

such that § 1985(3) would apply.   In sum, Farber has failed to state a claim under § 1985(3).  We proceed to discuss, in more detail, why that is so.

## A.    Farber Fails to Satisfy the Identifiable Class Requirement

It bears repetition that a § 1985(3) claimant must allege "some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action" in order to state a § 1985(3) claim.  *Griffin*, 403 U.S. at 102.  Regardless of the alleged basis for discrimination, however, and whether that basis is "invidious" or not, "the allegation of a 'class-based animus' naturally presumes that there is a specific, identifiable class against whom the defendants can have discriminated." *See Aulson*, 83 F.3d at 5.  At a minimum, *Griffin*'s use of the word "class"

> unquestionably connotes something more than a
> group of individuals who share a desire to engage
> in conduct that the § 1985(3) defendant disfavors.
> Otherwise, innumerable tort plaintiffs would be
> able to assert causes of action under § 1985(3) by
> simply defining the aggrieved class as those
> seeking to engage in the activity the defendant has
> interfered with.

*Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 269 (1993).

Thus, § 1985(3) defendants must have allegedly conspired against a group that has an identifiable existence independent of the fact that its members are victims of the defendants' tortious conduct.  This independent existence is necessary to preserve the distinction between two of the requirements of a § 1985(3) claim: that the conspirators be motivated by class-based invidiously discriminatory animus and that the plaintiff be the victim of an injury he or she seeks to remedy by means of § 1985(3).  If merely alleging the latter could satisfy the former, "the requirement of class-based animus

8

would be drained of all meaningful content," *Aulson*, 83 F.3d at 5 (citing *Bray*, 506 U.S. at 269), and would transform § 1985(3) into the "general federal tort law" Congress did not intend to enact. *See Bray*, 506 U.S. at 269.

In order to ensure that a § 1985(3) class has an independent identifiable existence, a reasonable person must be able to "readily determine by means of an objective criterion or set of criteria who is a member of the group and who is not." *Aulson*, 83 F.3d at 5-6. For example, "women," or "registered Republicans," may constitute an identifiable "class" as opposed to a more amorphous group defined by "conduct that the § 1985(3) defendant disfavors," such as "women seeking abortion," *see Bray*, 506 U.S. at 269, or "persons who support [political] candidates," *see Aulson*, 83 F.3d at 4-5.

In *Bray*, the Supreme Court held that abortion clinics and organizations that support abortion and have members who may wish to use abortion clinics failed to state a § 1985(3) claim against an anti-abortion organization whose "conspiratorial" efforts to obstruct access to abortion clinics allegedly deprived women seeking abortions of their right to interstate travel. 506 U.S. at 266-67. The Court explained that, while women generally constituted a "class" that might substantively qualify for § 1985(3) protection,[3] the subgroup of "'[w]omen seeking abortion' is not a qualifying class" because "the class 'cannot be defined simply as the group of victims of the tortious action.'" *Id*. at 269-70 (quoting *Scott*, 463 U.S. at 850 (Blackmun, J., dissenting)).

In *Aulson*, a local public officeholder brought a § 1985(3) claim against an incumbent group of "old guard politicians" who controlled town politics, alleging that he faced illegal searches and sham prosecutions because he was a "member[ ] of a political group which supports candidates who oppose the

---

[3] The Court did not need to answer this question given that the plaintiffs did not face discrimination "*because they are women*" or "*by reason of their sex*." *Bray*, 506 U.S. at 269-70.

9

politics of the 'old guard.'" 83 F.3d at 2 (alteration in original). The Court of Appeals for the First Circuit found that the plaintiff failed to allege discrimination by an identifiable class because

> this group is wholly indeterminate. It might include all the voters in Georgetown, or it might include only voters who have spoken out against incumbent selectmen, or it might include only the two individuals featured in the complaint, or it might include anyone whose inclusion would benefit the plaintiff at any given time. There is simply no way to characterize this group as an identifiable segment of the community by reference to any objective criteria, and, hence, it cannot serve as a cognizable class within the purview of § 1985(3).

*Id*. at 6 (citing *Gleason v. McBride*, 869 F.2d 688, 695 (2d Cir. 1989) (rejecting class status under § 1985(3) when the plaintiff alleged only that he was "a political opponent of the defendants and was extremely vocal in his opposition to their management of the [municipality]")).

In our own jurisprudence, we have often addressed the second question involved in the *Griffin* analysis – whether an identified class has been *invidiously* discriminated against such that one injured may avail himself or herself of § 1985(3) – without the need to address the predicate question of whether an objectively identifiable class existed in the first place, because the answer was obvious. In *Novotny*, for example, we held that § 1985(3) extended to women, who constitute an objectively identifiable class, while noting that *Griffin*'s class-based invidiously discriminatory animus requirement works to screen out claims where no class exists at all, citing, among others, our decision in *Jennings v. Shuman*, 567 F.2d 1213 (3d Cir. 1977).[4]

---

[4] In *Jennings*, we upheld the dismissal of the § 1985(3) claim of a plaintiff who alleged that he was maliciously prosecuted in an extortion scheme in violation of his procedural due process

10

*Novotny*, 584 F.2d at 1240-44, 1241 n.19. Similarly, we concluded, in *Lake v. Arnold*, that "the scope of . . . § 1985(3) is sufficiently broad to protect the mentally retarded as a class," assuming, albeit implicitly, that the mentally retarded constitute an objectively identifiable class in the first place. 112 F.3d 682, 685, 688 (3d Cir. 1997). Simply put, some groups, particularly those deemed to be distinguishable from others by immutable characteristics, such as African-Americans, women, and the mentally retarded, are so clearly accepted as objectively identifiable that no extended analysis is needed. As the Court in *Bray* demonstrated, however, it is not always a simple matter, particularly when what is at issue is a putative class defined, as here, by mutable characteristics such as opinion or conduct.

The District Court erred when it concluded that "Farber [pled] sufficient class-based animus when she alleged that Defendants conspired against her *because she is a Republican*." *Farber*, 327 F. Supp. 2d at 425 (emphasis added). Not only does Farber not allege in her complaint that she is the victim of discrimination because she is a Republican, she does not allege that she *is* a Republican and does not even allege that the "conspiracy" was motivated by a desire to discriminate against Republicans. Farber only alleges that she was terminated "because she was affiliated with and a supporter of the administration of former Mayor Martin G. Barnes,"[5] who, at

---

rights because we were unable from his complaint to "discern facts alleging a class-based discriminatory animus." 567 F.2d at 1221.

[5] Other parts of the complaint contain similar allegations:
Plaintiff was a public supporter and advocate of the policies of Mayor Martin G. Barnes. She believed Barnes' policies were good for the city of Paterson and openly expressed herself to that effect. . . . The defendants were aware of plaintiff's expression of support for the policies of Barnes.

. . . .

After his election, defendant Torres expressed his intent to terminate from employment

11

another point in her complaint, she identifies as a Republican. Indeed, Farber does not even argue that her support for Mayor Barnes, or her resulting injury, was founded on *his* status as a Republican.

When determining whether an independently identifiable class exists, there are differences between being discriminated against because of membership in a political party and being discriminated against because of support for the policies of a politician who also happens to be a member of the party. We need not discuss those differences, however, for the class Farber attempts to assert is so subjectively defined and "wholly indeterminate" that "[t]here is simply no way to characterize [it] as an identifiable segment of the community by reference to any objective criteria, and, hence, it cannot serve as a cognizable class within the purview of § 1985(3)." *See Aulson*, 83 F.3d at 6.[6]

---

> supporters of the prior administration. In a newspaper interview, Torres specifically referred to plaintiff as a supporter of the former administration and stated, falsely, that he had requested her resignation.
>
> . . . .
>
> The Union was also aware that defendant Torres terminated plaintiff because of her support for the policies of former Mayor Barnes and that the letter of termination predated Torres' assumption of office.
>
> . . . .
>
> The defendants' actions were motivated by class-based invidiously discriminatory animus, to wit, political animus.

(App. 105, 108, 110.)

[6] At oral argument, Farber attempted to remedy this defect by recasting the class as those City employees, such as herself, who suffered a First Amendment injury within the meaning of *Elrod v. Burns*, 427 U.S. 347 (1976), when they were fired by the City for their support of Barnes. The attempt was unsuccessful. Just as the

**B.** **Discriminatory Animus Directed at a Class Based on Political Affiliation is Not "Invidious"**

Even were we to ignore or forgive the pleading deficiencies and assume that Farber adequately alleged that the conspiracy was motivated by discriminatory animus aimed at a class based on political affiliation, that type of discrimination is not so "invidious" as to qualify for § 1985(3) protection.

We begin our analysis with what the Supreme Court has made clear: the victim of a conspiracy motivated by race discrimination may bring a § 1985(3) claim, *Griffin*, 403 U.S. at 102, while the victim of mere commercial or economic animus may not. *Scott*, 463 U.S. at 838. The Court has never found that a criterion other than race can serve as the basis for a qualifying class, but neither has it foreclosed that possibility, and we have held that victims of discriminatory animus directed at women, *see Novotny*, 584 F.2d at 1243, and the mentally retarded, *see Lake*, 112 F.3d at 688, may state a § 1985(3) claim.

Admittedly, we have sent mixed signals as to whether discriminatory animus directed at a class based on political affiliation can also so qualify. *Compare Perez v. Cucci*, 725 F. Supp. 209, 253 (D.N.J. 1989) (political affiliation qualifies as a § 1985(3) class), *aff'd*, 898 F.2d 142 (3d Cir. 1990), *with D'Aurizio v. Palisades Park*, 963 F. Supp. 378, 385-86 (D.N.J. 1997) (rejecting § 1985(3) claim because defendants merely conspired against plaintiff "because of his political association"), *aff'd*, 151 F.3d 1024 (3d Cir. 1998), *Stephens v. Kerrigan*, Nos. 95-615, 95-8093, 1996 U.S. Dist. LEXIS 6544, at *13 (E.D. Pa. May 13, 1996) (political affiliation cannot support a § 1985(3)

---

"women seeking [an] abortion" in *Bray*, and the "persons who support candidates opposed to the politics of the 'old guard'" in *Aulson*, this "definitional ploy" does no more than define the would-be class—non-policymaking City employees fired for their support of the former mayor—"as those seeking to engage in the activity the defendant has interfered with." *See Bray*, 506 U.S. at 269.

13

claim), *aff'd on other grounds*, 122 F.3d 171, 184 (3d Cir. 1997), *and Deblasio v. Zoning Bd. of Adjustment*, 820 F. Supp. 876, 885 (D.N.J. 1993) (rejecting § 1985(3) claim based on "[p]laintiff's allegation that he was discriminated against because he was not a political insider"), *aff'd in part*, *rev'd in part*, 53 F.3d 592, 596 (3d Cir. 1995).

Our sister courts of appeals are split on the issue.[7]  And, although it is still an open question in the Supreme Court, the Court, albeit in 1983, suggested how it would rule if squarely faced with the issue.  In *Scott*, non-union construction workers, who were attacked and beaten because of their non-union status, alleged that their union-member attackers had the requisite invidiously discriminatory animus for a § 1985(3) conspiracy claim.  The Court of Appeals for the Fifth Circuit agreed, reasoning that the non-union employees were akin to a political group, and that political groups are protected by § 1985(3) because, given its reading of the legislative history of the Ku Klux Klan Act, a § 1985(3) cause of action was intended not only to protect African-Americans but also their Republican supporters from the conspiratorial activities of the Reconstruction-era Ku Klux Klan.  463 U.S. at 835-38.

---

[7] *Compare Galloway v. Louisiana*, 817 F.2d 1154, 1159 (5th Cir. 1987) (holding that wholly non-racial animus directed at a political class qualifies under § 1985(3)), *Conklin v. Lovely*, 834 F.2d 543, 549 (6th Cir. 1987) (same), *Keating v. Carey*, 706 F.2d 377, 386-88 (2d Cir. 1983) (same), *and Means v. Wilson*, 522 F.2d 833, 839-40 (8th Cir. 1975) (same), *with Grimes v. Smith*, 776 F.2d 1359, 1366 (7th Cir. 1985) (§ 1985(3) does not reach non-racial political conspiracies), *and Harrison v. KVAT Food Mgmt. Inc.*, 766 F.2d 155, 163 (4th Cir. 1985) (same).  *See also Aulson v. Blanchard*, 83 F.3d 1, 5 (1st Cir. 1996) (declining to decide whether purely political non-racial conspiracies fall within § 1985(3)); *Hobson v. Wilson*, 737 F.2d 1, 21 (D.C. Cir. 1984) (same); *Schultz v. Sundberg*, 759 F.2d 714, 718 (9th Cir. 1985) (classes are only protected by § 1985(3) where "there has been a governmental determination that its members require and warrant special federal" protection).

14

The Supreme Court, however, was "unpersuaded," and explained that

> it is a close question whether § 1985(3) was intended to reach any class-based animus other than animus against Negroes and those who championed their cause, most notably Republicans. The central theme of the bill's proponents was that the Klan and others were forcibly resisting efforts to emancipate Negroes and give them equal access to political power. The predominant purpose of § 1985(3) was to combat the prevalent animus against Negroes and their supporters. The latter included Republicans generally, as well as others, such as Northerners who came South with sympathetic views towards the Negro.

*Id*. at 836.[8]

Despite its skepticism that § 1985(3) was intended to reach any group other than African-Americans and those who championed their cause, the Court found it unnecessary to decide that § 1985(3) does not reach non-racial, politically motivated animus, and instead held only that it did not reach the type of economic or commercial animus implicated by the violence against the non-union workers in that case. *Id*. at 837-38.

---

[8] The *Scott* Court acknowledged that, during debate over the Act, one Senator stated that § 1985(3) would reach conspiracies against a person discriminated against "because he was a Democrat, if you please, or because he was a Catholic, or because he was a Methodist, or because he was a Vermonter," *id*. 836-37 (quoting Cong. Globe, 42d Cong., 1st Sess., 567 (1871)), but discounted this statement's value in interpreting the section because the bill and its amendments originated in the House, not the Senate. *Id*.

15

### i. Congress's Acknowledgement in 1871 That Republicans Were Victims of Racially-Motivated Klan Violence Does Not Mean That § 1985(3) Was Intended to Give Victims of Political Discrimination a Cause of Action

Despite the dicta in *Scott*, the District Court chose to follow the decision of a district court holding that § 1985(3) reaches politically motivated conspiracies, a case that itself relied upon the Court of Appeals for the Second Circuit's pre-*Scott* decision in *Keating v. Carey*, 706 F.2d 377 (2d Cir. 1983). *Farber*, 327 F. Supp. 2d at 424-25 (citing *Perez*, 725 F. Supp. 209, 249-53).[9] Emphasizing the repeated statements of the 42d Congress that Ku Klux Klan hostility towards "Republicans" must end, *Keating* held that § 1985(3) was intended to provide all victims of political animus with a cause of action. 706 F.2d at 387; *see also Life Ins. Co. of N. Am. v. Reichardt*, 591 F.2d 499, 505 (9th Cir. 1979) ("[Section 1985's] Congressional debates evinced concern for all groups subject to the organized lawlessness of the Ku Klux Klan, including . . . Republicans."). *Keating* reasoned that while today the Klan is seen primarily as a racist organization, in 1871 it was also "a political organization intent on establishing Democratic hegemony in the South." 706 F.2d at 387. Therefore, not only were blacks the victims of Klan violence, but so

> were carpetbaggers or "men of Union sentiment," in a word, Republicans. Black or white, "the victims whose property is destroyed, whose persons are mutilated, whose lives are sacrificed, are always Republicans." *Cong. Globe*, 42nd Cong., 1st Sess. 412, col. 3, 413, col. 1 (1871) (remarks of Congressman Roberts). "The dead and the wounded, the maimed and the scourged,

---

[9] *Keating* was issued just three months prior to *Scott*. Despite *Scott*'s dicta, the Court of Appeals for the Second Circuit has since reaffirmed its holding in *Keating*. *See, e.g.*, *N.Y. State NOW v. Terry*, 886 F.2d 1339, 1359 (2d Cir. 1989).

are all, all Republicans." *Id.* at 426, col. 3 (remarks of Congressman McKee). "Every victim of Ku Klux outrage has been a Republican." *Id.* at 437, col. 2 (remarks of Congressman Cobb). The Klan's object is "the defeat of Republicanism." *Id.* at app. 196, col. 2 (remarks of Congressman Snyder).

*Id.* From this, the Court concluded that "Congress did not seek to protect only Republicans, but to prohibit political discrimination in general," arguing that to hold otherwise would be to "turn history on its head and exclude from protection the group that seems to have been foremost in the mind of Congress." *Id*. at 387-88.

Based on *Scott* and our own reading of the text of § 1985(3) and its legislative history, we disagree. It is certainly true that African-Americans and Republicans were victims of the Klan violence that prompted the enactment of § 1985(3). As to both groups, however, the invidiously discriminatory animus behind the Klan's actions was motivated by racial hatred, not by its victims' political party affiliation. *See Scott*, 463 U.S. at 836; *Keating*, 706 F.2d at 393-94 (Meskill, J., concurring and dissenting);[10] *Novotny*, 584 F.2d at 1244; *but see Keating*, 706

---

[10] Judge Meskill pointed out that

[a]s is commonly known, Lincoln Republicans of the 1860s and 1870s were the major political force behind black emancipation. To the extent that support for black rights was evidenced in the South, it was from white Republicans who were a small minority in that region. Not surprisingly, the Ku Klux Klan and other groups determined to achieve democratic hegemony in the South directed their physical assaults and threats of violence against both emancipated blacks and their Republican supporters. To counter this threat, the Civil Rights Acts were enacted to ensure that those denied access to the polls and the courthouse due

17

F.2d at 388 n.17. That many victims of racially motivated Klan violence happened to be Republicans does not mean that the discriminatory animus they faced was *because* they were Republicans. In *Bray*, for example, the Supreme Court found that because the victims of a conspiracy motivated by opposition to abortion were all women did not mean that the discriminatory animus they faced was because they were women. 506 U.S. at 269-70. The § 1985(3) plaintiff's status as a Republican or as a woman was incidental to the motivating factor behind the defendants' discriminatory animus.

Thus, the repeated statements in the legislative history that § 1985(3) would serve to protect Republican, often white, victims of Klan violence, *see Novotny*, 584 F.2d at 1244, does not mean that § 1985(3) was intended to reach discriminatory animus directed at a class based on political affiliation or that, more specifically, Republicans victimized by animus directed against Republicans can ride the coattails of Republicans victimized by animus directed against African-Americans. Instead, the legislative history underscores the view that a § 1985(3) plaintiff need not be a member of the class against which a conspiracy directs its invidiously discriminatory animus, even if in practice this is most often the case. We long ago held that this is so. *See Richardson v. Miller*, 446 F.2d 1247, 1249 (3d Cir. 1971) (finding that a non-minority victim of racially

---

to mob violence and vigilantism would be protected by the federal courts.

Taken out of historical context, it would seem that the only requirement of Republicans for protection under section 1985(3) is that they be victims of discrimination. This view, however, does not comport with the underlying purpose of the 1871 Act. The general intent of this legislation was very narrow — to protect blacks and black supporters in the post-Civil War South.

*Keating*, 706 F.2d at 393-94 (Meskill, J., concurring and dissenting).

discriminatory animus can state a § 1985(3) claim).[11]  And, as we explained in *Novotny*, where we held that a *male* victim of sexually discriminatory animus directed at *women* could state a § 1985(3) claim, the text

> provides a cause of action in any instance where "in furtherance of the object of" a proscribed conspiracy an act is done "whereby another is injured in his person or property."  By its terms, the statute gives no hint of any requirement that the "other" must have any relationship to the "person or class of persons" which the conspiracy seeks to deprive of equal protection, privileges or immunities.

584 F.2d at 1244.

In order for victims of discrimination based on political affiliation to state a § 1985(3) claim, it must be independently determined that discrimination on that ground is invidious in the same way that discrimination directed at African-Americans is invidious.  We address that issue next.

### ii.  Discrimination Against a Class Based on Political Affiliation is Not Invidious for Purposes of § 1985(3)

The Supreme Court has explained that

> [t]he nature of the "invidiously discriminatory animus" *Griffin* had in mind is suggested both by the language used in that phrase ("invidious . . . tending to excite odium, ill will, or envy; likely to give offense; esp., unjustly and irritatingly discriminating," Webster's Second International Dictionary 1306 (1954)) and by the company in which the phrase is found ("there must be *some*

---

[11] *Richardson*'s holding was cited approvingly in *Robison v. Canterbury Vill., Inc.*, 848 F.2d 424, 431 n.7 (3d Cir. 1988).

> *racial, or perhaps otherwise class-based*,
> invidiously discriminatory animus," *Griffin*, 403
> U.S. at 102 (emphasis added)).

*Bray*, 506 U.S. at 274.  The Court then concluded that "the goal of preventing abortion, . . . in itself . . . does not remotely qualify for such harsh description, and for such derogatory association with racism," and, thus, the victims of discriminatory animus resulting from a conspiracy to prevent abortion could not sue under § 1985(3).  *Id*. at 274.  If the goal of preventing abortion does not qualify, then surely neither does the goal of replacing, with one's own, members of an opposing political party in an exercise of classic political patronage.

In the past we have emphasized the "irrational and odious" nature of discrimination motivated by a class's immutable characteristics because such characteristics are "determined by the accident of birth" and "bear[] no relation to ability to perform or contribute to society."  *Novotny*, 584 F.2d at 1243 (citing *Frontiero v. Richardson*, 411 U.S. 677, 686-87 (1973)).  Thus, we have found discrimination directed toward women to be invidious.  *Id*. at 1243-44.  Following *Novotny*, we have also held that discrimination "based on . . . mental handicap, like that based on gender, often rests on immutable characteristics which have no relationship to ability.  Where this is the case, we are convinced that the discrimination is invidious . . . ."  *Lake*, 112 F.3d at 687.  While we do not hold that discrimination motivated by a mutable characteristic can never be invidious, political affiliation surely does not qualify.[12]

---

[12]  A new administration is justified in replacing policymaking employees with members of its own party in order to ensure "that representative government not be undercut by tactics obstructing the implementation of policies of the new administration."  *See Elrod*, 427 U.S. at 367.  Thus, unlike race discrimination, political patronage (at least at times) has a rational basis.

20

One final note. Allowing § 1985(3) to reach politically motivated conspiracies would involve the federal courts in policing the political arena in ways that the drafters of § 1985(3) could not have intended. As Judge Pollak long ago explained, political patronage "plays a major role in all politics," and while *Elrod* and *Branti v. Finkel*, 445 U.S. 507 (1980), place constitutional limits on this role, "it can be reasonably assumed that private political actors will continue to press government officials to exercise such partisan leeway as the hiring and firing processes still permit, conformably with the Court's decisions." *Nilan v. DeMeo*, 575 F. Supp. 1225, 1227 (E.D. Pa. 1983). Permitting § 1985(3) to reach politically motivated conspiracies would effectively outlaw all terminations based on political affiliation. *Keating*, 706 F.2d at 394 (Meskill, J., concurring and dissenting). It is unlikely that Congress "contemplated that the Civil Rights Act would strike the death knell to a way of political life that flourished then and remains an accepted incident of elective office." *Id*. And, of course, extending § 1985(3) to politically motivated conspiracies would "go far toward making the federal courts, by virtue of § 1985(3), the monitors of campaign tactics in both state and federal elections, a role that the courts should not be quick to assume." *Scott*, 463 U.S. at 836.

For the foregoing reasons, we hold that § 1985(3) does not provide a cause of action for individuals allegedly injured by conspiracies motivated by discriminatory animus directed toward their political affiliation. We will reverse the District Court's denial of the Union's motion to dismiss Farber's § 1985(3) claim.

### III. <u>Statute of Limitations for a Duty of Fair Representation Claim at Law</u>

Farber alleged that the Union breached its duty under the New Jersey Employer-Employee Relations Act ("EERA"), N.J. Stat. Ann. § 34:13A-1 *et seq*., to fairly represent her "by refusing to pursue [her] grievance and by abandoning all efforts to support her." (Comp. ¶¶ 44-45.) The Union moved to dismiss this duty of fair representation ("DFR") claim, alleging that it

21

was time-barred. The District Court disagreed, and denied the motion. The District Court was correct to do so.

Under the EERA, a union has the exclusive right to represent the interests of public employees. N.J. Stat. Ann. § 34:13A-5.3. Along with this exclusive right, however, a union has a "corresponding duty" of fair representation, which means that it must process meritorious employee grievances in "complete good faith, with honesty of purpose and without unfair discrimination against a dissident employee or group of employees." *D'Arrigo v. N.J. State Bd. of Mediation*, 574 A.2d 44, 47 (N.J. 1990). Failure to do so exposes a union to an "unfair practice" claim under N.J. Stat. Ann. § 34:13A-5.4(b) before the Public Employment Relations Commission ("PERC"), which has the "exclusive power" to hear such claims under N.J. Stat. Ann. § 34:13A-5.4(c).[13] "Unfair practice" claims brought

---

[13] Section 34:13A-5.4(c) reads:
[t]he commission shall have exclusive power as hereinafter provided to prevent anyone from engaging in any unfair practice listed in subsections a. and b. above. Whenever it is charged that anyone has engaged or is engaging in any such unfair practice, the commission, or any designated agent thereof, shall have authority to issue and cause to be served upon such party a complaint stating the specific unfair practice charged and including a notice of hearing containing the date and place of hearing before the commission or any designated agent thereof; *provided that no complaint shall issue based upon any unfair practice occurring more than 6 months prior to the filing of the charge* unless the person aggrieved thereby was prevented from filing such charge in which the event the 6-month period shall be computed from the day he was no longer so prevented.

(emphasis added).

22

before the PERC are subject to a six-month statute of limitations. *Id*.

The District Court concluded, and we agree, that PERC's "exclusive power" to hear unfair practice claims would not preempt a DFR claim *at law*. Analogizing to *Vaca v. Sipes*, 386 U.S. 171, 187-88 (1967), the Court held that if confronted with the issue, the Supreme Court of New Jersey "would recognize a cause of action at law under the EERA for a union's breach of its DFR." *See Farber*, 327 F. Supp. 2d at 420. In *Vaca*, the Supreme Court held that an employee could sue her union for breach of the duty of fair representation implied in § 9(a) of the National Labor Relations Act, even though "unfair labor practice" claims, such as breach of the duty of fair representation, usually can be heard only by the National Labor Relations Board. 386 U.S. at 176-88.

The District Court also concluded that New Jersey's six-year statute of limitations for "any tortious injury to the rights of another," N.J. Stat. Ann. § 2A:14-1, would apply to an EERA-DFR claim at law. *Farber*, 327 F. Supp. 2d at 421-22. Again, we agree. In *Gomez v. Government of the Virgin Islands*, we held that the Virgin Islands' general two-year statute of limitations, V.I. Code Ann. tit. 5, § 31(5)(A), applied to a DFR claim brought in court under the Virgin Islands Public Employee Labor Relations Act ("PERLA"). 882 F.2d 733, 737-38 (3d Cir. 1989). PERLA is the Virgin Islands' counterpart to New Jersey's EERA, and just as New Jersey courts use NLRA case law to interpret the EERA, *see Lullo v. Int'l Ass'n of Fire Fighters*, 262 A.2d 681, 689 (1970), we use NLRA case law to interpret PERLA. *Gomez*, 882 F.2d 737 n.8. Unlike the EERA, however, PERLA expressly provides a cause of action in the Virgin Islands courts and in federal court for breach of a duty of fair representation, *see* V.I. Code Ann. tit. 24, § 383, in addition to providing for the filing of a complaint for unfair labor practices before the Public Employee Relations Board ("PERB"), *see* V.I. Code Ann. tit. 24, § 379, the Virgin Islands' equivalent of New Jersey's PERC. Section 383 does not contain a statute of limitations for DFR claims brought in court, and, in *Gomez*, we rejected the argument that we should, therefore,

borrow § 379's six-month statute of limitations for claims before PERB. 882 F.2d at 738. We reasoned that we were not permitted to borrow § 379's statute of limitations because V.I. Code Ann. tit. 5, § 31(5)(A) already provides a general catch-all two-year statute of limitations for tort actions, and a DFR claim is a form of tort action. *Gomez*, 882 F.2d at 738.

The Union argues that *Gomez* is distinguishable because, unlike the EERA, PERLA explicitly provides for DFR claims to be brought in court. This may be true, but the difference is immaterial. Each Act has a section that permits unfair labor practice claims to be brought before an administrative body subject to a six-month statute of limitations. *See* N.J. Code. Ann. § 34:13A-5.4 (PERC); V.I. Code Ann. tit. 24, § 379 (PERB). Each Act also permits (either expressly or impliedly) DFR claims to be brought before a court from a source other than the section that provides for unfair labor practice claims before the administrative body. *See* N.J. Code. Ann. § 34:13A-5.3 (implied by District Court here); V.I. Code Ann. tit 24, § 383 (express). Thus, under both Acts, the six-month statute of limitations must be "borrowed" from some external source in order to apply to a DFR claim brought in court. In *Gomez*, we explained that we cannot circumvent a state legislature's decision to provide a general catch-all statute of limitations for tort claims, and thus may not borrow the six-month limitations period. Our reasoning in *Gomez* is applicable here.

The Union also argues that because of the policy considerations underlying the EERA, a six-year statute of limitations should not apply to DFR claims because "it undermines the [PERC's] authority," and "undermines the balance crafted by the New Jersey Legislature which allows for such claims so long as they are promptly presented to the agency which has special expertise and responsibility for public sector labor law." (Appellee's Br. 18 (citing *Kaczmarek v. N.J. Turnpike Authority*, 390 A.2d 597, 601-05 (N.J. 1989)). As a matter of policy, the Union is most likely correct. In *Kaczmarek*, the Supreme Court of New Jersey explained that the six-month statute of limitations for "unfair practices" promotes the "prompt filing and expeditious processing of charges," which is

24

"especially important in the volatile field of employer-employee relations. In addition to preserving the immediacy of the record, administrative celerity stabilizes existing bargaining relationships, and inhibits the festering or aggravation of labor disputes." 390 A.2d at 602.

In *Gomez*, however, we acknowledged these same policy considerations, and explained that they were of legislative, not judicial, concern:

> Our decision today is based on the language of Virgin Islands statutory law. Any lack of uniformity in the filing of PERLA actions as a result of our decision today must be resolved by the Virgin Islands legislature. The policy considerations which the Supreme Court in *DelCostello* noted favor a short statute are even more appropriate subjects for legislative concern.

*Gomez*, 882 F.2d at 739 n.9.

In sum, we will follow *Gomez* and will affirm the conclusion of the District Court that New Jersey's six-year statute of limitations "for any tortious injury to the rights of another," N.J. Stat. Ann. § 2A:14-1, applies to a DFR claim brought in court. We leave it to the New Jersey legislature to shorten the limitations period for such a claim if it deems it appropriate to do so.

## IV. <u>Conclusion</u>

We conclude, in answer to the first certified question, that those who share a political affiliation are not a cognizable class for purposes of § 1985(3), and, in answer to the second certified question, that New Jersey's six-year statute of limitations applies to an EERA-DFR claim brought in court. Accordingly, we will reverse the District Court's order denying the Union's motion to dismiss Farber's § 1985(3) claim, and will affirm its order denying the Union's motion to dismiss her DFR claim.