# U.S. COURT OF APPEALS FOR THE THIRD CIRCUIT

No. 25-1548

REUVEN LYAK,
Appellant

V.

CITY OF HACKENSACK;
RAYMOND GUIDETTI, Individually and in his official capacity;
BENNY MARINO, Individually and in his official capacity;
XYZ CORP, INC.;
JOHN DOES (1-10);
JANE DOES (1-10)

———————————————

Appeal from the U.S. District Court, D.N.J.
Senior Judge William J. Martini, No. 2:23-cv-13104

Before: BIBAS, PORTER, and BOVE, *Circuit Judges*
Submitted Jan. 27, 2026; Decided Apr. 1, 2026

———————————————

NONPRECEDENTIAL OPINION[*]

PORTER, *Circuit Judge*.

Reuven Lyak, a police officer and union representative, claimed municipal defendants intentionally retaliated against him for his protected speech and association. But mere disagreement with internal department-wide policies is not enough to plausibly allege constitutional violations in federal court. We will affirm the District Court's dismissal.

———————————————

[*] This disposition is not an opinion of the full Court and, under 3d Cir. I.O.P. 5.7, is not binding precedent.

I

Reuven Lyak is a police officer for the City of Hackensack and vice president of the PBA Local 9 police union. Lyak was a "close associate" of Lt. Anthony DiPersia, president of the PBA Local 9A supervisory police officer union. Appendix ("App.") 32. In 2022, an audit of the police department revealed that some police officers were getting paid twice, amassing tens of thousands of dollars on top of their regular pay by manipulating their schedules to complete "extra duty details."[1] The audit results showed that "the number of arrests dropped by 85% while overtime costs soared by 115%." App. 33. The story made local news, drawing condemnation from residents for the "alleged abuse of taxpayer dollars." App. 33. So the city hired new police leadership, presumably to tighten the belt—Raymond Guidetti as police director and Benny Marino as his executive assistant.

Guidetti sought to reform the extra-duty policy but was opposed by DiPersia, who accused him of "unlawful conduct and acting beyond the legal scope of his employment." App. 33. Lyak criticized the proposed policy changes. Lyak felt that some of the organizational and department-wide changes were targeted at him. He complained to the local union, other officers and their families, and city residents. The union issued a vote of no confidence against Guidetti, but that did not slow him down.

---

[1] "Extra duty details" included things like providing traffic control at construction sites, and were outside the scope of an officer's usual shift responsibilities. Officers who manipulated their schedules would clock in for their usual shift, accept and complete extra duty in the middle of their usual shift (without clocking out), then finish their usual shift when the extra duty ended. This enabled those officers "to be paid twice for the same hours worked." App. 33.

2

Over the next few months, Guidetti began implementing the policy changes. He amended a policy to require that any extra duty details needed to be completed an hour before the officer's regular shift. Around the same time, Lyak put in for a shift change that would allow him to maximize the amount of extra-duty time he could work, but his requested shift change was not granted in full. Instead, he picked up extra-duty shifts for a few hours before his regular shift and then arranged for an outside entity to cover the remainder of the extra-duty shift. Later, the policy was updated again so that an officer was not permitted to accept an extra-duty shift unless he could work at least half of the detail.

A few months after these policy changes, Lyak was reassigned to another position in the department. Lyak conceded that the transfer appeared to be "prestigious and a promotion," but argued that it was really a "clear demotion . . . to humiliate" him. App. 40. A month after that, Lyak was transferred again, as were 15 other officers. This time, Lyak alleges his transfer was to a "far lower position" than the other officers' transfers. App. 44. A few days later at Guidetti's direction, he was "written up" for allegedly violating the extra-duty policy. Lyak emailed the entire union membership the next day, communicating that union leaders were being "singled out," presumably by the reassignments and disciplinary action. App. 48.

On August 30, 2023, Lyak commenced a civil rights action, alleging that the reassignments and disciplinary action were intentional acts of retaliation for his protected speech and association. The District Court dismissed the case without prejudice after Lyak failed to respond to defendants' motion to dismiss. Lyak moved to reopen the case and for leave

3

to file an amended complaint. The District Court denied both motions. Lyak timely appealed.

## II

The District Court had jurisdiction under 28 U.S.C. §§ 1331, 1343, and 1367(a). We have jurisdiction under 28 U.S.C. § 1291.

We review the District Court's grant of a motion to dismiss de novo. *Chang v. Childs.' Advoc. Ctr. of Del. Weih Steve Chang*, 938 F.3d 384, 386 (3d Cir. 2019). On review, we will "accept as true all allegations in the complaint and all reasonable inferences that can be drawn therefrom, and view them in the light most favorable to the plaintiff." *Evancho v. Fisher*, 423 F.3d 347, 350–51 (3d Cir. 2005). "[T]o survive a motion to dismiss, a plaintiff must allege facts sufficient to make it 'plausible' the defendant is liable." *Migliore by Migliore v. Vision Solar LLC*, 160 F.4th 79, 87 (3d Cir. 2025).

We review the District Court's denial of Rule 60 and Rule 15 motions for abuse of discretion. *Penn W. Assocs., Inc. v. Cohen*, 371 F.3d 118, 124 (3d Cir. 2004) (Rule 60); *In re NAHC, Inc. Sec. Litig.*, 306 F.3d 1314, 1323 (3d Cir. 2002) (Rule 15).

## III

This appeal presents four primary issues: whether the District Court (1) erred by finding that Lyak did not engage in protected speech or association under § 1983 and the New Jersey Civil Rights Act, (2) erred by finding that Lyak failed to plead a procedural due process claim, (3) erred by finding that Lyak failed to plead a § 1985 claim for conspiracy, and (4) abused its discretion by denying the motion to reopen and for leave to file an amended complaint. We will affirm on each issue.

4

A

Lyak did not plausibly allege that he faced retaliation for engaging in protected First Amendment speech or association under § 1983 and the New Jersey Civil Rights Act.[2]

To plead a retaliation claim under the First Amendment, a plaintiff must allege that: "(1) he engaged in constitutionally protected conduct, (2) the defendant engaged in retaliatory action sufficient to deter a person of ordinary firmness from exercising his constitutional rights, and (3) a causal link [existed] between the constitutionally protected conduct and the retaliatory action." *Javitz v. Cnty. of Luzerne*, 940 F.3d 858, 863 (3d Cir. 2019) (citation omitted; alteration in original).

To determine whether employee speech is constitutionally protected conduct, we employ the familiar *Pickering-Connick* balancing test, which asks: (1) whether the employee spoke as a citizen, and (2) whether the topic is a matter of public concern. *Connick v. Myers*, 461 U.S. 138, 143, 146 (1983). If those threshold questions are answered in the affirmative, then we "balance [] the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs." *Id.* at 142 (quoting *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968)) (second alteration in original).

---

[2] The New Jersey Civil Rights Act is coextensive with § 1983, so we analyze those claims together. *Falcone v. Dickstein*, 92 F.4th 193, 205 n.8 (3d Cir. 2024). To the extent that Lyak argues the New Jersey Constitution protects a public employee's right to "make known . . . grievances and proposals through representatives of [his] own choosing," Lyak cannot transform his status as a union leader into a constitutional violation any time the department implements new policies with which he disagrees. *See* N.J. Const. art. I, § 19.

5

Lyak did not speak as a citizen, so he does not clear the first threshold factor. His attempt to couch his departmental grievances and internal policy preferences as a public-safety concern is unavailing. Lyak spoke as a police officer on matters directly related to his employment—departmental policy and reassignment. His dissatisfaction with those policies and his reassignments were "matters only of personal interest . . . [so] a federal court is not the appropriate forum" for reviewing the city's employment decisions. *Amalgamated Transit Union Loc. 85 v. Port Auth. of Allegheny Cnty.*, 39 F.4th 95, 103 (3d Cir. 2022) (quoting *Connick*, 461 U.S. at 147). "[T]he First Amendment does not require a public office to be run as a roundtable for employee complaints over internal office affairs." *Connick*, 461 U.S. at 149 (holding that an employee's concerns regarding office transfer policy, morale, and supervisors were not of public concern).

And even if Lyak clears the second threshold question, it is clear from the proposed amended complaint ("PAC") that his departmental grievances and internal policy preferences are outweighed by the state's interest in promoting efficiency, particularly considering the audit results that revealed significantly fewer arrests and soaring overtime costs. While the audit results may well have been a matter of public concern, Lyak's gripes with the way the police department addressed those results were not outweighed by the city's interest in doing so.

On the second retaliation element, though it is hardly clear that Guidetti and Marino's actions were sufficiently retaliatory to deter a person of ordinary firmness from exercising his constitutional rights, Lyak's allegations that his first reassignment was designed to create resentment against him and humiliate him may clear the low threshold. *See Baloga v.*

6

*Pittson Area Sch. Dist.*, 927 F.3d 742, 758–59 (3d Cir. 2019). On the second reassignment, however, Lyak offers nothing more than bald assertions that the reassignment was less than favorable. And on his alleged discipline, he fails to explain what it means to be "written up."

In any event, Lyak shows no causal link between the constitutionally protected conduct and the alleged retaliatory actions (his reassignments and the disciplinary action). Lyak was first reassigned months after he spoke out about the extra-duty policy, and he did not allege any pattern of antagonism that persisted. Moreover, the policy changes and later reassignments affected more than a dozen officers, not just Lyak, and were implemented to rectify significant police department problems brought to light by the audit. Even construed favorably to Lyak, the allegations in the PAC are too attenuated to suggest that the department-wide policy changes and reshuffling of officers were pretextual.[3]

### B

The District Court held that Lyak failed adequately to plead a due-process violation by alleging he was deprived of a property interest in his job. That was not error.

To state a procedural due process claim under § 1983, a plaintiff must allege that: "(1) he was deprived of an individual interest that is encompassed within the Fourteenth Amendment's protection of 'life, liberty, or property,' and (2) the procedures available to

---

[3] Although Lyak invokes "association" as a separate right, he has not asserted a pure associational claim. Rather, the claim is based on his association with DiPersia as a fellow critic of the extra-duty policy. That associational claim is coextensive with the speech claim, so it too will be dismissed. *See Palardy v. Twp. of Millburn*, 906 F.3d 76, 81, 84 (3d Cir. 2018).

him did not provide 'due process of law.'" *Hill v. Borough of Kutztown*, 455 F.3d 225, 233–34 (3d Cir. 2006) (citation omitted).

Lyak does not plausibly allege the deprivation of a liberty or property interest. Lyak asserts that he had "a liberty or property interest in his employment with the Defendant City of Hackensack and his reputation as a police officer and Vice President of PBA Local 9," and that Guidetti and Marino's actions led to "damage to his reputation . . . and damage to future career prospects." App. 54, 55.

True, Lyak has a protected liberty interest in his reputation. But we usually recognize a deprivation of that liberty interest only when a public employee satisfies the "stigma-plus" test, i.e., when the employee is stigmatized by public statements and terminated from employment. *Hill*, 455 F.3d at 236 ("[W]hen an employer 'creates and disseminates a false and defamatory impression about the employee in connection with his termination,' it deprives the employee of a protected liberty interest." (quoting *Codd v. Velger*, 429 U.S. 624, 628 (1977))). "The creation and dissemination of a false and defamatory impression is the 'stigma,' and the termination is the 'plus.'" *Id.* Here, Lyak does not meet either prong of that test. The only purported stigmatizing statements that Lyak points to were made by an "ally of . . . Guidetti" at a private union meeting. Appellant's Br. 22 (citing App. 49). He makes no allegation that the purported "stigmatizing statements" were public, or that he was terminated. Not even his pay or formal rank were diminished.

Lyak also has a protected property interest in being a police officer. *See Elmore v. Cleary*, 399 F.3d 279, 282 (3d Cir. 2005) ("[S]tate law determines whether such a property interest exists."); N.J. Stat. Ann. § 40A:14-147 ("[N]o permanent member or officer of the

8

police department or force shall be removed from his office, employment or position . . . , nor shall such member or officer be suspended, removed, fined or reduced in rank from or in office, employment, or position therein, except for just cause . . . ."). Here though, Lyak was one among many police officers who were affected by the department-wide changes to policy and reassignments. Again, he alleged no decrease in pay or formal reduction in rank whatsoever. And other than threadbare assertions that he was "reassigned," "demot[ed]," and "written up" on the early warning system, Lyak failed plausibly to allege that he was "suspended, removed, fined or reduced in rank" or pay sufficient to establish deprivation of his property interest. App. 40, 44; *see* N.J. Stat. Ann. § 40A:14-147.

Even if Lyak plausibly alleged deprivation of his liberty or property interests, he failed plausibly to allege that "the procedures available to him did not provide 'due process of law.'" *Hill*, 455 F.3d at 234. Lyak says Guidetti violated city policies and procedures by failing to give him a chance to contest the discipline in advance. But he does not mention whether he was offered a hearing, denied a hearing, or even asked for one. Lyak only alleges that he complained to Marino about being written up and later emailed all union members about his qualms. *See Alvin v. Suzuki*, 227 F.3d 107, 116 (3d Cir. 2000) ("In order to state a claim for failure to provide due process, a plaintiff must have taken advantage of the processes that are available to him or her, unless those processes are unavailable or patently inadequate.").

C

Lyak also does not plead sufficient facts to show discriminatory animus against an identifiable class. So his conspiracy claim was properly dismissed.

9

A conspiracy claim under 42 U.S.C. § 1985(3) requires a plaintiff to plausibly allege that (1) the conspiracy "was motivated by discriminatory animus against an identifiable class," and (2) "that the discrimination against the identifiable class was invidious." *Farber v. City of Paterson,* 440 F.3d 131, 135 (3d Cir. 2006).

Lyak's claim that Guidetti and Marino conspired against "a class of union leaders who opposed Defendant Guidetti's changes to the extra duty policy" fails to allege discriminatory animus against an identifiable class. Appellant's Br. 25. The "group [must have] an identifiable existence independent of the fact that its members are victims of the defendants' tortious conduct." *Farber*, 440 F.3d at 136. Not so here, where the alleged class of union leaders opposed to Guidetti's policies exists only because of changes to the extra-duty policy and the ways those changes allegedly impacted the class. And, unlike discrimination on the basis of race or sex, discrimination on the basis of union membership and policy opposition is not invidious discrimination under § 1985(3). *Cf. id.* at 135 ("[D]iscrimination on the basis of political affiliation is not, as a matter of law, discrimination so invidious such that § 1985(3) would apply.").

D

The District Court did not abuse its discretion by denying Lyak's motion to reopen and for leave to file an amended complaint.

Rule 60 allows a party to seek relief from final judgments and orders in limited circumstances. Fed. R. Civ. P. 60(b). Rule 15 allows a party to move for leave to amend its pleadings, which "[t]he court should freely give [] when justice so requires." Fed. R. Civ. P. 15(a)(2). And "an order dismissing a complaint without prejudice is not a final order as

long as the plaintiff may cure the deficiency and refile the complaint." *Ahmed v. Dragovich*, 297 F.3d 201, 207 (3d Cir. 2002). Here, even if the dismissal without prejudice was final, permitting the filing of the PAC would have been futile under Rule 15 because, as we discuss above, it does not state any plausible claim for relief. *See In re NAHC, Inc.*, 306 F.3d at 1332 (noting that the futility analysis for motion to amend is the same as for a motion to dismiss). So the District Court did not abuse its discretion by denying Lyak's motion to reopen and for leave to file an amended complaint. *Ahmed*, 297 F.3d at 209 ("When a party requests post-judgment amendment of a pleading, a court will normally conjoin the Rule 60(b) and Rule 15(a) motions to decide them simultaneously, as it 'would be a needless formality for the court to grant the motion to reopen the judgment only to deny the motion for leave to amend.'").

\* \* \*

For these reasons, we will affirm the District Court.